Filed 1/8/24  In re A.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D082737 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4673) |
| v. | |
| A.T., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

A.T. (Father)[1] appeals following the jurisdictional findings and removal order in the dependency case of his son, A.T. (Son), contending that they are unsupported by substantial evidence.  We affirm.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Son was approximately 10 days old when the San Diego Health and Human Services Agency (Agency) filed a protective custody warrant and dependency petition on his behalf (Welf. & Inst. Code,[2] § 300, subd. (j)). Son's dependency petition alleged he was in need of juvenile court protection under section 300, subdivision (j), because his older sibling, S.T. (Daughter) sustained nonaccidental injuries in the care of her parents. Because Son's dependency petition is inextricably linked with Daughter's, we begin by reviewing Daughter's dependency matter.

A. *Daughter's Injuries and Dependency Petition*

Father and J.V. (Mother) (together the parents) had Daughter in June 2021.  At that time, the family lived together with the paternal grandmother, paternal great-grandmother, paternal aunt, and paternal uncle.

When Daughter was approximately two months old, her parents brought her to a children's hospital emergency room "due to unresponsive behaviors," "overheating," and "her eyes . . . rolling back."  The parents claimed they believed Daughter was suffering a "heat seizure."  Daughter "presented with bruising on her left cheek and left arm" as well as bruises and scratches on her face and body, and inside her cheek.  Father claimed

---

[1]    Mother is not a party to this appeal.

[2]    All further undesignated statutory references are to the Welfare and Institutions Code.

that Daughter urinated on him the night before, which increased his anxiety, and that she subsequently slipped from his hands and into the sink while he washed her. Father stated that the paternal grandmother was present in the home during the incident, but in fact she was out of town. While the bruising on Daughter's left side "aligned with the fall into the sink," she also had abrasions on the inside of her mouth, the right side of her head, and behind her right ear. Accordingly, staff at the children's hospital made a report with the police.

Two weeks later, a "skeletal survey showed [Daughter] had five fractures on her legs." All were healing, though some were newer than others. Neither parent disclosed the source of the fractures, which medical staff determined to be nonaccidental. These fractures were inconsistent with a fall or drop into the sink. Daughter's doctor explained the fractures "can only happen by shaking the baby, slamming the baby down, or violently pulling the baby's extremities."

The San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (a), petition in August 2021 on Daughter's behalf. Father and Mother maintained that they "[had] no idea how [Daughter] obtained multiple fractures to her body." Daughter was initially placed with a foster family in August 2021. Father reportedly told others that he believed the doctor who reported on Daughter's injuries was lying, and that the numerous fractures could be "growth fractures." Mother believed the fractures "were likely due to [Father] swaddling [Daughter] 'the wrong way.'" Paternal grandmother asserted to the Agency that Daughter's neonatal jaundice made her bones "soft," which the doctor disputed.

San Diego Police arrested Father in August 2022 for felony violations of Penal Code sections 273a(a) (child cruelty) and 273d(a) (inflicting injury upon

a child.) In conjunction with his arrest, the criminal court issued a criminal protective order for Daughter. Father texted his mother that he was stressed and " '[j]ust going to plead guilty.' " Around the time of Father's arrest, in the summer of 2022, when Daughter was approximately 14 months old, Mother returned Daughter to her caregiver after a supervised visit "with scratches and redness on her upper back." During another visit, Mother's dog bit Daughter. The maternal aunt who supervised that visit blamed the dog bite on Daughter, stating, "[Daughter] decided that she wanted to get close to the dog" and that Mother and the aunt knew the dog "isn't very friendly with younger kids."

In January 2022, the juvenile court sustained the Agency's petition and declared Daughter a dependent under section 300, subdivision (a). Shortly thereafter, Father and Mother moved alone into on-base military housing in Coronado. At the subsequent March 2022 disposition hearing, the juvenile court determined neither Mother nor Father made progress "toward alleviating or mitigating the causes necessitating placement," and ordered continued placement away from them. A nonrelative family member (Caregiver) accepted placement of Daughter in March 2022.

Mother and Father briefly separated in November and December 2022, During this period, Father reported feeling suicidal, but he later denied making those statements. Mother and Father currently live together, and Father continues to serve in the military.

B. *Son's Birth and Subsequent Agency Involvement*

In March 2023, Father and Mother had Son after an unplanned pregnancy. After his birth, the hospital declined to discharge Son with the parents due to the history of child abuse. The following day, the child abuse hotline received a report, citing concern for Son.

On March 29, 2023, the Agency filed a section 300, subdivision (j) petition alleging "there is a substantial risk that [Son] will be abused or neglected." To explain the risk, the Agency cited the extensive physical injuries Daughter sustained when she was two months old. Son was taken into protective custody under section 340, subdivision (a) and placed with Daughter in the same resource family home. The Agency inquired if the parents had any family or friends who could live with them to ensure Son's safety, but the parents were unable to identify anyone. An attempt to hold a child family team meeting with the parents was unsuccessful as they canceled in the hours before.

C. *Parents' Engagement in Services and Responsiveness to the Agency*

At Father's criminal preliminary hearing in April 2023, the judge found probable cause to proceed on both charges. Father did not respond to the Agency's inquiries into the status of his criminal case.

Both parents were slow to begin services after Daughter was removed from their custody and were inconsistent with their participation in services. While the parents eventually participated in a handful of marriage counseling sessions, they continued to fight and subsequently stopped attending. Notably, Father did not engage in individual therapy until late January 2023. His therapist believed he was withholding information from her, including the nature of Daughter's injuries, and recommended Father continue in individual therapy to address his anxiety and other issues. We can find no evidence in the record that he has done so. Father made " 'modest progress' " in his child abuse parenting group, though he often earned mediocre scores for his empathy and insight. Insight reflects the "ability to understand that something did happen to the baby that was not accidental." Without insight, the Agency is concerned that the focus is not on

the children, what happened to Daughter, or providing safety. Although his parenting group leader stated he had "no concerns" about Father, he also described the group as "superficial." He disclosed that his assessment is based only on what group members "want [him] to know." Father neither acknowledged that Daughter experienced abuse nor admitted his role in the injuries. Finally, although Father was asked to complete a 12-week domestic violence program, he failed to do so.

Mother attended her child abuse group from approximately January 2022 until April 2022 before quitting. She reenrolled in the group in August 2022. However, she was "disengaged and not interested" in the group; she completed only three homework assignments and seven journal entries over the course of 27 sessions. According to the group leader, Mother does only "the 'bare minimum.' " Mother began attending the group nearly a year after Daughter was removed, after she learned she was pregnant with Son. After nearly 18 months of receiving services for Daughter's dependency case, Mother still did not have a child abuse safety plan and she " 'made no improvement, has little empathy for [Daughter], and is not showing insight.' " Mother was "unable to identify warning signs or red flags of child abuse," despite her classes, and demonstrated "distorted blame." Mother indicated she "would come up with a safe word with her children," but they were both too young to use safe words.

Further, Mother " 'doesn't understand why the Agency is making her complete a [domestic violence] group' " in spite of reporting domestic violence herself. After attending only a few sessions, she quit the domestic violence program; again, she reengaged only when she was "very pregnant" with Son. She disclosed that she often fought with Father "over small things" and his fidelity, and that Father engages in "financial abuse in their marriage.

Despite her claim that there have been no physical altercations, she disclosed to her domestic violence group that she once called Father an "idiot" and that it led to "him putting hands on her." This incident occurred in January 2022. The Caregivers became uncomfortable supervising joint visits "due to 'arguing, jealousy, and disrespect' " between Father and Mother. The paternal grandmother reported that Father pushed Mother out of the way during a visit with Daughter and other family during a 2022 Easter celebration. In December 2022, the Caregiver witnessed the parents "trying to snatch phones out of each other's hands" while Daughter was in Mother's lap. Finally, Mother was often rated only a 2 or 3 for acceptance of responsibility and empathy, and a 0 for insight.

Ultimately, as the parents neared the 18-month review of their dependency case for Daughter, they had made "minimal progress in their case plan" and maintained only "supervised visit[s]" with Daughter. Despite their extensive and prolonged services, both parents "show little insight" as to Daughter's injuries. Daughter had not been returned to their custody and the Agency did not believe either parent was prepared to move to unsupervised visitation with either child. Further, the criminal protective order remained in place, limiting Father's contact with Daughter.

The Caregivers reported that the Mother and Father did not check in or ask for pictures of their children. They did not maximize their time with their children and were "often late." Mother and Father have canceled visits with little warning and inconsistent explanations. The Caregiver also reported Father panicking while changing Daughter's diaper, and being rough with Daughter. The paternal grandmother had similarly warned Father to play more gently. Father became overwhelmed with services and voluntarily decreased his individual visits, then indicated he was not

7

available during proposed supervised visitation dates and times. When Father received a copy of the Agency's report, he confronted the Caregiver over her reported statements, which the Caregiver described as him "trying to bully" her.

D. *Jurisdiction and Disposition Hearing for Son*

After Son's detention, the Agency requested that the court make a true finding on the petition and an order that Son be removed from parents' custody. Son's counsel supported the Agency's request. In July 2023, the court held a multi-day contested evidentiary hearing. At the conclusion of the hearings, the court stated that it had considered the totality of the circumstances, including the injuries Daughter endured, Daughter's age at the time of the injuries, the parents' participation in services, and domestic violence concerns, and found that Son was at substantial risk for nonaccidental injury. The court credited Father's participation in a child abuse program, but noted that Father's progress was offset by his failure to acknowledge the abuse to Daughter "despite medical evidence to the contrary." The court therefore made a true finding as to the petition and declared Son a dependent of the juvenile court. Further, considering the evidence in support of the jurisdictional finding as well as unaddressed domestic violence and a lack of commitment to marriage counseling, the court ordered removal from the parents' custody, with supervised visitation.

II.

DISCUSSION

A. *Substantial Evidence Supports the Juvenile Court's Jurisdiction Order*

On this record, we disagree with Father's contention that there was insufficient evidence to support the jurisdictional order.

Section 300, subdivision (j) allows the court to declare a child a dependent of the court when (1) "[t]he child's sibling has been abused or neglected" and (2) "there is a substantial risk that the child will be abused or neglected" as defined in subdivisions (a), (b), (d), (e), or (i).

At the jurisdictional hearing, the court considers only whether the child is a person described by section 300. The Agency must prove that a child is a person described by section 300 by a preponderance of the evidence. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318; § 355, subd. (a).) "The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative . . . ." (§ 300, subd. (j).)

On appeal, Father has the burden of showing the jurisdictional findings are unsupported by substantial evidence. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135; disapproved on another ground by *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) In applying this standard, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.) We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence. (*Id.* at p. 996.)

Substantial evidence supports the juvenile court's jurisdictional findings under section 300, subdivision (j). It is undisputed that Daughter was adjudged a dependent under section 300, subdivision (a) due to the

9

nonaccidental harm inflicted upon her by a parent.[3]  Thus, we consider whether substantial evidence supports the trial court's finding by a preponderance of the evidence that there is a substantial risk that Son will suffer serious physical harm inflicted nonaccidentally upon him by a parent. (See § 300, subds. (a) and (j).)

It is undisputed that the parents have not physically harmed Son.  This fact is not particularly helpful in the analysis, however, because Son has never lived with the parents and has never had unsupervised time with them.

At the time the court declared Son a dependent, he was approximately four months old.  As found by the court in her dependency case, when Daughter was similar in age, and while she lived with six family members, she suffered serious nonaccidental injuries inflicted by a parent or guardian. A doctor specializing in child abuse concluded Daughter's injuries were both nonaccidental and inconsistent with the various purported explanations offered by Father, Mother, and their family members.  Her skeletal survey suggested repeated abuse, given the healing and new fractures in her legs. Father now faces charges for inflicting those injuries upon her.

Against this backdrop of injury to Son's sibling, we consider the parents and their commitment to becoming safe and protective.  The Agency designed

---

3     As Father admits, "no party disputes that [Daughter] 'has been abused or neglected as defined by section 300[,] [subdivision (a).]' "  Father is estopped from relitigating the nature of Daughter's injuries.  (*In re Joshua J.* (1995) 39 Cal.App.4th 984, 994–995.)  As in *Joshua J.*, we reject Father's "suggestion that the juvenile court's prior true finding in [Daughter's] dependency proceeding had limited relevance . . . [because the] true finding was a conclusive adjudication on the merits that [Daughter] was abused, which was one of two issues presented by the section 300, subdivision (j) petition."  (*Id.* at pp. 993–994.)

a plan to remedy the identified issues and to support the parents in reunifying with Daughter, but the parents declined to meaningfully participate in those services until they identified the risk of a second dependency petition upon the birth of Son. The parents stopped participating in child abuse group, domestic violence group, individual therapy, and marriage counseling. Additionally, Father failed to participate in visitation with Daughter for a period of time. The lack of commitment and lack of progress indicate that parents have not learned how to address the conditions that gave rise to Son's dependency matter.

The parents have, further, failed to gain insight into Daughter's abuse. While Father, alone, appeals, we must contextualize his progress alongside Mother's. Son, if returned to Father's care, would also reside with Mother. The parents and their identified support system insist that the fractures are growth fractures, that the doctor is lying, that swaddling caused the multiple fractures, and that Daughter's jaundice at birth made her bones "soft." A child abuse doctor disagrees with these explanations. Because of these assertions, the Agency and various service providers repeatedly reported that the parents lack insight into Daughter's injuries. Their continued lack of insight into Daughter's injuries demonstrates their inability to understand what protection and safety entails and they, therefore, cannot provide protection and safety to Son.

While the parents expressed affection and care for Son, the record is clear that they made the same assertions regarding Daughter, who nevertheless experienced significant physical abuse. We conclude there was substantial evidence to support the court's finding by a preponderance of the evidence that there was a substantial risk that Son, who was similar in age, affection, and vulnerability to Daughter, would suffer serious physical harm

11

inflicted nonaccidentally. Therefore, the court did not err in finding that the petition was true and in declaring Son to be a dependent of the juvenile court.

B. *Substantial Evidence Supports the Juvenile Court's Dispositional Order*

Concluding the juvenile court had substantial evidence to find jurisdiction over Son, we turn to whether substantial evidence supports the court's dispositional order removing Son from Father's physical custody.

"The fundamental right to the care and custody of one's child is protected by Constitution and statute." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525 (*Henry V.*); accord *In re Jasmon O.* (1994) 8 Cal.4th 398, 419–420; *In re James T.* (1987) 190 Cal.App.3d 58, 64.) "A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature." (*Henry V.*, at p. 525.)

Section 361 imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. (§ 361, subd. (c).) It provides that "[a] dependent child shall not be taken from the physical custody of his or her parents, . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The statute further provides "[t]he court shall consider, as a reasonable means to protect the minor," the option of removing the offending parent from the home (§ 361, subd. (c)(1)(A)), and whether the nonoffending parent

12

"presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm" (§ 361, subd. (c)(1)(B)).

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.) The court has broad discretion in selecting a disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

We review a dispositional order removing a child from a parent for substantial evidence, " 'keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.' " (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) Here, Father, as the party challenging the juvenile court's order, has the burden to show there is insufficient evidence to support the court's decision. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103.)

We conclude that the evidence supporting the jurisdictional findings also supports the dispositional order, even under the higher "clear and convincing evidence" standard. As discussed above, there is substantial evidence that returning Son to the parents would have resulted in a substantial danger to his physical health. We conclude there is also substantial evidence to support the court's finding by clear and convincing evidence that removal was necessary to protect Son from the type of abuse suffered by his sibling.

Father asserts removal from their collective physical custody was improper and we, accordingly, will evaluate the parents collectively, particularly because the parents live together.

In the prior section, we have discussed Father's first contention, regarding the substantial danger to Son's physical health, safety, and protection above. Next, we address Father's second contention, regarding domestic violence. He contends that the domestic violence dynamic "has no bearing on whether [Son] is at substantial risk of being abused or neglected." Though Father did not take part in the voluntary domestic violence classes, Mother did and she is or should be aware of "the effects of domestic violence to the brain of children."

Multiple parties including Mother report that they continue to fight often. Father asserts on appeal that the altercation he had with Mother in 2022 was "a [s]ingle [i]ncident." Our review of the record indicates it was one of three such disclosed incidents in the calendar year. These incidents, coupled with the asserted financial abuse, support the court's concerns regarding domestic violence dynamics between Father and Mother and the effect it would have on Son. While Father stated they "do not believe to resorting to violence" when it comes to parenting, we find his claim challenging to reconcile with the incidents described and the record as a whole.

Next, we address the parents' "response to the conditions that gave rise to the court's intervention." They demonstrate a pattern of briefly engaging in services before quitting. The success of their reunification services is dependent on their willingness to participate. Father's therapist believed he was withholding information critical to moving forward. Mother rarely completed homework assignments and did only the bare minimum. Father

faces charges for the injuries Daughter sustained and Mother has not developed a plan to keep a child or children safe. Father mischaracterizes their efforts and states both parents have made "significant progress" toward reunifying with Daughter. The court describes the progress as limited, and it is significant that after 18 months, the parents had not yet graduated to unsupervised visits with Daughter. Mother's "lack of overall progress" was actually "a huge concern" for the Agency and it was "below expectation."

We note that both Father and Mother name their family members as their support network. When Daughter sustained her bruises and fractures, there were four other adults living in the home, many of whom are now listed as supports for the parents. The same family members are among those who have been unwilling to admit that Daughter was nonaccidentally injured, have failed to protect her during visits, and have blamed her for being bitten by a dog when she was 12 months old. They cannot reasonably be expected to now ensure Son's safety should he be returned to the parents' physical custody. Further, Father and Mother are living alone together in on-base military housing. They were unable to provide the name of someone who could live with them to protect Son. If Son returned to their physical custody, there is no one else present to monitor their interactions with Son or ensure his safety and well-being. Son's young age means that he is incapable of protecting himself from the sort of physical violence that caused Daughter's injuries. As a young child, he is deserving of special protection (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), and the paramount purpose underlying the dependency proceeding is the protection of the child. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) A dependency petition is brought to benefit the child, not to punish the parents. (*In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599.)

On these facts, we conclude there was substantial evidence to order removal from the parents.

## DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

16